Filed 7/22/26  In re M.G. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re M.G. et al., Persons Coming Under the Juvenile Court Law. | B345764 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 24CCJP03750) |
|     Plaintiff and Respondent, | |
|     v. | |
| M.C., | |
|     Defendant and Appellant, | |
| S.P., | |
|     Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge. Affirmed.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant M.C.

Katie M. Curtis, under appointment by the Court of Appeal, for Defendant and Respondent S.P.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica J. Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

---

Mother M.C. appeals from dispositional orders removing 14-year-old M.G. and six-year-old J.P. from her custody and placing J.P. with J.P.'s father, S.P. Mother contends placement of both children with the maternal grandmother in Georgia under the Interstate Compact on the Placement of Children (ICPC) would have vitiated the need to remove the children from her custody. And mother contends placement of J.P. with his father was unsafe given his father's history of domestic violence. Placement with maternal grandmother without removal from mother, however, had significant risks given mother's unresolved violence and instability and the need for Georgia officials to finish analyzing the suitability of maternal grandmother's home. In contrast, J.P.'s father demonstrated improved conduct, which included extended visitation with J.P. without issue, attendance at domestic violence programming, and proactive efforts to resolve his criminal case. Substantial evidence, then, supports the juvenile court's orders, and we affirm.

## BACKGROUND

### A. *Children's Detention and Failed Safety Plan*

In November 2023, J.P.'s biological father (but not M.G.'s) kicked down mother's bedroom door, threw her to the ground, and choked her. Father took a cellphone from M.G. to prevent her from notifying law enforcement, but she left and alerted a neighbor instead. Mother was bruised and suffered a spinal compression fracture from the incident. Father did not hurt the

2

children.  Mother and father were separated at the time.  The Department of Children and Family Services substantiated the referral but closed its investigation without initiating a dependency proceeding because the situation stabilized.  A warrant was issued for father's arrest.

A year later, in November 2024, mother, a traveling nurse and Iraq-war veteran with a history of PTSD and bipolar disorder, suffered suicidal ideations and made a plan to overdose on medication.  But mother aborted her plan and instead opted to go to the Veterans Affairs hospital seeking help.  After a medical assessment, the hospital placed mother on an involuntary psychiatric hold.

While mother arranged for a maternal aunt to watch her children during the psychiatric hold, that aunt was in Georgia and would not arrive for three days.  Since no other family was present, the department took protective custody of the children.  The department placed them with a resource parent, a caregiver named Ms. G.

Four days after mother's release, the department filed a dependency petition alleging mother's mental health and drug abuse endangered the children.  Mother, upset she could not visit her children, accused the resource parent of stealing the children and threatened to file criminal charges.

The court held a hearing on December 3, the day after the petition was filed.  Mother testified about her medication compliance, including limited noncompliance after she fled from father's domestic violence the year before.  Mother sought the children's release under the condition that she would stay in Los Angeles while the maternal grandmother from Georgia would take the children back to Georgia.

Over the department's objection, the court released the children to mother in accordance with her proffered safety plan. The court also required department-approved housing, unannounced department visitation, drug testing, and medication compliance. Mother's counsel clarified this was a release to a parent with an appropriate plan, not an out-of-state placement under the ICPC. Maternal grandmother arrived from Georgia on December 5, two days after the hearing.

On December 6, 2024, the department again sought detention, arguing mother had not complied with the safety plan. At the hearing, the court expressed concern "that mother might not be medication compliant and was not willing to test, and she had a lack of trust with the department." Mother's counsel disputed these contentions. Children's counsel described how maternal grandmother had a calming effect on mother and understood the challenges of her PTSD. The court again denied the detention request. Separately, the court granted a temporary restraining order protecting mother, the children, maternal grandmother, and mother's adult child from father.

Just days later, on December 10, a violent incident transpired between mother, maternal grandmother, and the children. According to maternal grandmother, mother was angry in a way maternal grandmother had not seen before. While the family was at a resource center, mother returned to her car, tried to pull maternal grandmother out of the car, and threatened to "bust [child M.G.] in the head." Mother then took J.P. to the mall, returned to the family's Airbnb, hit M.G. in the head, and attacked maternal grandmother. M.G. recounted a similar version of events, stating mother "came up to me and was yelling at me. My grandmother came out because she wanted to protect

4

me.  She started recording me.  My mother got mad.  Attacked her.  Snatched her phone.  My grandmother got to pull her back into the house and grabbed the phone.  My mom broke my grandmother's nail[,] and it was bleeding.  She went back out there and then charged back in and hit me on the head.  She assaulted me and assaulted my grandmother.  We did not feel safe."

On December 11, the court vacated its prior order, detained the children from mother, and placed the children with maternal grandmother, who would stay in California with the children until the next court date.  The children remained with maternal grandmother in California until December 20 and then accompanied her, with court permission, to Georgia on an extended visit until January 9, 2025.  When the children returned, they were placed with the caregiver until the adjudication hearing on February 27, 2025.

**B.** *Pre-Adjudication Investigation and Report*

The department conducted an investigation and prepared a report for the adjudication hearing.

Mother denied that she was placed on a psychiatric hold at the start of the case but advised she had a team managing her mental health.  Mother had moved to California to get away from maternal grandmother, whom she called a narcissist that viewed her as an enemy.  Mother described how maternal grandmother "saw an opportunity to take [the] children" and had been insulting to mother.  Mother had defended herself from maternal grandmother and never hit M.G.  Maternal grandmother just wanted money, and both she and M.G. were liars.  Mother remained upset with the department and yelled at the social worker who tried to set up visitation.

5

Father lived with his current partner along with her children and her mother. He worked as a truck driver; she was a former behavioral therapist. The department had no safety concerns with father's home or his partner's family. Father attended domestic violence programming and provided character references from his pastor and a friend.

Father had not seen or spoken with J.P. or mother since November 2023. He confirmed mother had moved to California because she did not get along with maternal grandmother. He also expressed concern about J.P. going to Georgia because he had heard that a cousin had molested M.G. before he had met mother; M.G. later described to a social worker one incident when she was six and a nine-year-old cousin touched her over her clothes.

Father's arrest warrant related to his 2023 assault of mother had been outstanding. Father surrendered in Lancaster in December 2024, and criminal proceedings began. After the preliminary hearing, the criminal court issued a protective order for mother and M.G. (apart from the juvenile court's restraining order), and father was held to answer but released on bond.

By mid-February 2025, mother had not had family time with the children, but father's visits with J.P. had gone well. Father called often to speak to J.P. Mother, meanwhile, was combative with the caregiver on the phone.

A social services specialist assessed maternal grandmother's Georgia home and found ample food, no home repairs, appropriate sleeping arrangements, and no weapons. The department nonetheless had received numerous law enforcement and protective services reports involving not only

maternal grandmother, but also mother and father while they were present in her home.

The department obtained 12 law enforcement reports from Georgia involving mother or maternal grandmother and dating from 2018 to 2024. Reports of these visits described a domestic disturbance between mother and maternal grandmother in 2019; a simple battery between mother, maternal grandmother, and mother's now-adult son in 2019; a verbal domestic dispute between mother and maternal grandmother in 2019; battery and cruelty to a child when father, in 2020, punched in the face mother's then-16-year-old child (not a dependent in this proceeding); a thrown chair during a 2022 incident involving maternal grandmother and her other daughter; a verbal dispute over money between maternal grandmother and her other daughter in 2023; a simple assault involving maternal grandmother and a coworker in 2023; and threats involving allegations maternal grandmother inappropriately disciplined her grandchildren in 2024.

The department also obtained two law enforcement reports involving mother in California. The first report disclosed mother's arrest for driving under the influence in late 2023, just after the domestic violence episode. The children had not wanted to get into the car with mother because they believed she was too drunk to drive, so a friend picked them up. Mother accused the friend of kidnapping, but the officer determined mother was under the influence of alcohol and no kidnapping had occurred.

The second report disclosed that six days before this case's inception, law enforcement evicted the mother from her house. Officers arrived and called for mother to exit the house. One retrieved a battering ram. As this happened, M.G. opened the

door, and an officer saw mother holding J.P.'s hand. Mother was handcuffed, detained, and released in the field. She told the officers she was suffering from anxiety and PTSD, "which is why she could not understand what was occurring." The officers let her gather some personal belongings before leaving the scene.

### C. *Adjudication*

The adjudication hearing took place on February 27, 2025. By then, the department had added two counts to the dependency petition alleging mother's physical abuse of M.G. and father's prior domestic violence. The court sustained the petition and issued a year-long restraining order protecting mother and M.G. from father. The court remarked that mother had not complied with the initial safety plan, remained combative with the social workers and caregiver, was resistant to complying with the court's orders, and had been self-medicating. Maternal grandmother was not at fault and "had a measure of success in controlling mother's outbursts," but they remained "unrelenting." The court stated it could not then order an ICPC because the parties contested disposition. It then ordered J.P. on an extended visit with father, and M.G. on an extended visit with maternal grandmother in Georgia. These visits would last until the March disposition hearing.

### D. *Pre-Disposition Investigation*

Both extended visits went well, with no reported issues. Mother had a positive, monitored telephonic visit with J.P. in early March of 2025. Afterwards, though, mother phoned the social worker, yelled at her, called her a liar, and claimed she recorded their conversations over the social worker's objection. The record does not disclose visitation between mother and M.G. after the violent December 2024 incident.

8

On March 12, a social worker met mother at the VA hospital, mother's requested location. The social worker provided mother with resources and offered to make calls together. Mother was angry and yelled "4 months bitch!" and "stupid bitch! I don't want no resources." The social worker started to leave and saw mother charging at her with the folder containing the department's resource materials in her hand, as if she would hit the social worker. Two nearby police officers intervened. Mother continued to call the social worker a "stupid bitch" and advanced on the social worker despite the officers' presence. One officer blocked mother while the other shielded the social worker. One of the officers said he knew mother because he had received prior calls to restrain mother at the VA. He recommended future interactions occur at a police station. The department determined that all future interactions with mother would occur at the department or a police station.

On March 26, 2025, the date of the scheduled disposition hearing, mother's counsel advised the court that mother had moved to Georgia. This prompted a continuance. M.G. was placed with the caregiver while the court extended J.P.'s visit with father.

Mother refused to provide the department with an address in Georgia, fearing the department would tell father, and texted the department she did "not trust that you all are the least bit concerned for my safety and wellbeing whatsoever. You all took my kids from me and left me in the streets to die. Why would I ever trust anything that you all say or do as it pertains to what's being in my best interest." The maternal grandmother told the department she thought mother was "not coming back to Georgia," and a case manager at an organization called US Vets

told the department she had seen mother in California as late as March 21. The department came to believe mother might not have actually relocated back to Georgia.

Father's criminal case had not completed by disposition.

### E. *Disposition*

At the continued disposition hearing, mother's counsel objected to J.P.'s release to father and requested "an ICPC for both minors to be placed with maternal grandmother in Georgia." Mother also objected to the court ordering a case plan for her. Father presented attendance, enrollment, and proof of completion of a domestic violence program. The court declared the children dependents of the court and removed them from mother. The court ordered the department to expedite review of maternal grandmother in Georgia for M.G.'s placement under the ICPC, and released J.P. to father under the department's supervision. M.G. remained with the caregiver under the department's custody.

Mother timely appealed.

## DISCUSSION

The removal and placement orders that mother challenges are both supported.

## I.

Substantial evidence supports the juvenile court's finding that no reasonable means short of removal would adequately protect the children's safety.

A court may remove a child from a parent's physical custody only if clear and convincing evidence establishes (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if "returned home," and (2) "there are no reasonable

means by which the minor's physical health can be protected without removing the minor" from the parent's custody. (Welf. & Inst. Code, § 361, subd. (c)(1); *In re Hailey T.* (2012) 212 Cal.App.4th 139, 145–146.) Mother's conduct, current circumstances, and response to conditions underlying the dependency allegations are relevant considerations. (See *In re D.B.* (2018) 26 Cal.App.5th 320, 332; see also *In re V.L.* (2020) 54 Cal.App.5th 147, 156.)

We review a removal order for substantial evidence, but we "attune" that standard to account for the heightened burden of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 997; see also *In re L.O.* (2021) 67 Cal.App.5th 227, 245.) Accordingly, we determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.*, at p. 1011.) Mother has the burden to show the record lacks that substantial evidence. (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

The department correctly points out that substantial evidence supports, and indeed there is no dispute, that mother's unresolved violent tendencies posed a substantial danger of harm to the children. Within days of the children's release to mother at the case's inception, under a plan that included maternal grandmother's presence with the family, mother attacked maternal grandmother and hit M.G. in the head, all in the presence of J.P. Mother's combative behavior continued. She yelled and cursed at the social workers and the children's caregiver, culminating in law enforcement having to intervene at the VA hospital to physically block mother from harming a social worker. Mother's conduct led the department to insist that future meetings occur at the department or a police office.

11

Meanwhile, mother repeatedly denied she struck M.G. and grandmother and believed each had lied about the events. Even at disposition, mother continued to shift the blame for her violent conduct to maternal grandmother and her child.

Mother's assertion, then, is that the court erred in removing her children because she had developed a plan for their care — entrustment to the maternal grandmother in Georgia under the ICPC — that was a "reasonable means" to protect them and avoid removal. According to mother, the court even implemented her proposed plan when it agreed, at disposition and in tandem with removal, to an expedited review of maternal grandmother in Georgia under the ICPC. The court's agreement to this plan, argues mother, shows the plan was a reasonable alternative to removal. But the court's removal order did not implement mother's precise plan.

At the disposition hearing, mother's counsel sought "an ICPC for both minors to be placed with maternal grandmother in Georgia." The court ordered the department to conduct an expedited review of maternal grandmother under ICPC and for M.G. to remain in suitable placement with the caregiver under the department's supervision in the meantime. It did not order a review of maternal grandmother as to J.P.

That the court agreed a future placement with maternal grandmother could be in M.G.'s best interest does not undermine the court's removal order. While M.G. had positive extended visits with maternal grandmother and the department had assessed maternal grandmother's home, the ICPC review process had not been completed. There was extensive police and child protective services activity at maternal grandmother's Georgia home, supporting the need to conduct the ICPC review.

Moreover, placement with maternal grandmother without removal from mother had failed before, leading M.G. to suffer physical harm. Mother's relationship with maternal grandmother was unstable, combative, and elicited violence. Mother viewed maternal grandmother as antagonistic and out to take her children. Throughout the proceedings, mother repeatedly requested foster care placement rather than placement with maternal grandmother. And mother had left Georgia to get away from maternal grandmother. With mother indicating a desire to move back to Georgia, the children remained at risk in a placement in maternal grandmother's care without removal from mother.

Mother's attempt to liken her case to our decision *In re A.M.* (2025) 114 Cal.App.5th 627 is unavailing. There, we held the juvenile court improperly "remove[d] a child from her father simply because her father [was] in prison." (*A.M.*, at p. 629.) Father had made suitable arrangements for his child's care during his incarceration, and there was no evidence the child had been affected by father's criminal conduct. (*Id.* at pp. 633–634.) Our facts are different. The evidence supports a finding that mother's plans were not suitable.

## II.

Substantial evidence also supports the court's decision to place J.P. with father.

If a noncustodial parent requests custody, "the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (Welf. & Inst. Code, § 361.2, subd. (a).) Mother does not challenge the applicability of the legislative preference for placement with a

13

noncustodial parent, but asserts the court erred in finding the placement suitable. Since the department objected to J.P.'s placement with father, we appointed father counsel to defend the court's decision on appeal.

Ample evidence supports the lack of a detriment finding. (*In re K.B.* (2015) 239 Cal.App.4th 972, 979.)

Mother asserts the court had to find detriment because father assaulted mother in November 2023, father had no contact with J.P. for the following year until the dependency proceedings began, and placement with maternal grandmother would have allowed for a continued sibling relationship with M.G.

We certainly do not condone father's violent conduct. But the court was permitted to look beyond the earlier domestic violence incident and analyze father's current status. (Cf. *In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1506 [noncustodial parent's history and circumstances may remedy conditions that could otherwise lead to detriment finding].) In the time between the assault and the department's involvement, father did not harass or further harm mother. Mother faults father for not having contact with J.P. after the incident, but it was mother who kept the children from him.

Upon learning about the instant proceedings, father was proactive and responsive. Within 10 days of the department telling him a warrant had been issued for the earlier domestic violence incident, father self-surrendered to law enforcement. The department interviewed father's girlfriend, her children, and her mother, and none feared or expressed concerns about father. They each described him lovingly, denied any abusive behaviors, and wanted to care for J.P. in their home. Father, for his part,

14

began attending domestic violence programming and submitted character references to the department and court.

Finally, J.P. and father had developed a strong relationship during the dependency proceedings.  After removing J.P. from the temporary restraining order in December 2024, father began visits with J.P.  The visitation went well, and father communicated with J.P. often.  J.P. had three extended visits with father totaling 39 days, and the department reported no incidents.  The two had developed a bonded relationship by disposition, and father sought opportunities to develop that relationship throughout the proceedings.  Further, while not determinative, J.P.'s wish to be placed with father after successful visitation was relevant.  (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1402.)

Lastly, while, as mother notes, a juvenile court may consider the benefits of maintaining a sibling relationship when placing a child under Welfare and Institutions Code section 361.2 (see *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1423), that consideration is not determinative.  Here, the children had two different fathers and had been on different extended visits between adjudication and disposition, which each went well.  The court considered the benefits of a sibling relationship and ordered the department to facilitate sibling visitation notwithstanding the different placements.  Mother points to no evidence in the record compelling a finding that J.P.'s placement with father would be so detrimental to either child as to risk their well-being.

In sum, the juvenile court could reasonably have found that placement with father would not be detrimental to J.P. given his significant progress and the stable, positive environment he could offer.

## DISPOSITION

We affirm the juvenile court's dispositional orders.

SCHERB, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.